Tallman, Appellant, *v.* Reading Company.

Argued November 12, 1934.

Before TREXLER, P. J., KELLER, CUNNING-HAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Samuel H. Humes*, of *Humes & Baird*, for appellant.

*John G. Reading* of *Reading & Wood*, for appellee.

OPINION BY CUNNINGHAM, J., March 1, 1935:

Plaintiff recovered a verdict in the sum of $2,000 as damages for the death of her husband, George M. Tallman, in a collision between a truck, of which he was the driver, and a passenger train of the defendant company at a point where Miller's Lane crosses its tracks, at grade, in Lycoming County. Defendant did not ask for a new trial but moved for judgment in its favor n. o. v. After argument before the court below, in banc, that tribunal, upon a review of the whole record, concluded that "no negligence of the defendant was proven under any of the charges made, and, further, that plaintiff's decedent was guilty of contributory negligence;" from the judgment then entered for the defendant we have this appeal by the plaintiff.

Plaintiff's statement of claim contained six specifications of negligence; some of them were disproved by the evidence of her own witnesses and others were abandoned at the trial. As we understand the record, her claim to recover was finally based upon the contention that the truck stalled upon the crossing and that defendant's engineman should have seen it standing on the crossing "sufficiently far ahead to make stopping possible."

With a few exceptions, the facts were uncontroverted. Miller's Lane, a public highway running north and south, crosses three tracks of the defend-

ant company at right angles and at grade. These tracks, running east and west (south and north in railroad parlance), were level and straight for a distance of approximately a quarter of a mile west of the crossing and a much longer distance east thereof. The crossing was protected by flashing beacons and danger signals on each side. Tallman was employed by the Faxon Lumber Company at its yards, located upon the south side of the railroad tracks and about 300 feet east of the crossing. From the yards a private driveway extends westwardly along the south side of the tracks, and at a grade about three feet below them, out to Miller's Lane. This driveway enters Miller's Lane at a point some 20 feet south of the first track—referred to by railroad employes as the southbound track.

About noon on a clear day, October 6, 1930, Tallman drove a truck of his employer westwardly along the driveway into Miller's Lane; he turned north upon that highway and had proceeded upon the crossing to such an extent that the front portion of his truck was either upon or just across the southern rail of the first track when it was struck by one of defendant's passenger trains proceeding eastwardly on that track. It was a regular passenger train and running on time; the engineman had given warning of its approach by whistle blasts sounded at a proper distance.

At a point 550 feet west of the crossing defendant's tracks are carried over Miller's run by a trestle bridge, referred to throughout the testimony as the "gut" bridge.

The evidence for plaintiff was conflicting with respect to the distance the train traveled beyond the crossing after the accident. One of her witnesses fixed this point at a telegraph pole "right below [the Faxon office];" another said, "I imagine the engine was about down to the Faxon office." Other witnesses for

plaintiff estimated the distance from two car lengths to 400 feet.

The chief eye witness called by plaintiff was C. A. McKinney, a track walker, who testified that he was filling a switch light opposite the eastern end of the Faxon building when his attention was attracted by the whistle of the approaching train. Excerpts from his testimony read:

"Q. Did you see the train which struck George Tallman? A. Yes. Q. What attracted your attention to it? A. The whistle. Q. Did the train whistle? A. Yes. Q. Did you look up at that time? A. Yes, I was stooped over picking up my tools when the whistle drawed my attention. Q. Where did you see the train? A. Well, now, that is pretty hard for me to judge, looking at it in the face of a train like that, it is quite a distance away. ...... Q. Do you know where the train was when the whistle blew? A. Well, it whistled before I looked up and when I looked up it was whistling yet. Q. Where was it then? A. As near as I could judge he might have started to whistle on the turn, because it is not far from the gut bridge and he was whistling yet when I looked up. Q. Where was he with reference to the gut bridge? A. Pretty close to it. Q. In other words, he was almost to the gut bridge? A. As near as I could judge. Q. Now this gut bridge you speak of, what do you mean by that? A. It is a trestle bridge above the crossing. ...... Q. From the bridge to the Miller's Lane crossing is the track straight or curved? A. You mean,— Q. The railroad track? A. The railroad track,—it is straight. Q. West of the gut bridge how is it? A. It is straight for a distance up to the turn. ...... Q. Now, Mr. McKinney, at the time you looked up, did you see this truck in which Mr. Tallman was riding? A. Yes, I did. Q. Where was it when you saw it? A. It looked to me, from my distance away, it looked to

me as though his front wheel was just over the outside rail, as near as I could judge from the distance I was away. Q. By 'over the rail,' you mean it had crossed one rail of the south bound track? A. It might have been right on it, or just over it. I wouldn't say from the distance I was away from it. Q. And you have said it looked to be just over it? A. Yes. Q. Was it standing still, or in motion, at the time you saw it? A. Standing still. Q. Could you see the operator of the truck? A. No, I could not. Q. Could you see what he was doing? A. No, I didn't.''

The engineman of the train, G. W. Davis, when called by plaintiff, testified that when crossing the gut bridge the train, consisting of an engine, tender and three coaches, was running about 40 or 45 miles an hour. There was evidence for the plaintiff by an experienced engineman that a train of this length, proceeding at that speed along a level track, could be brought to an emergency stop within a distance of from 450 to 500 feet.

The testimony of the engineman, when called by the defendant, was that he began to blow the whistle at "the whistle board" located west of the bridge. With relation to the circumstances under which the collision occurred, his testimony reads:

"Q. When did you first see the automobile, or truck, that was hit by your engine that day? A. The first sight I got of the automobile, or the truck, was when it was coming on the crossing probably three or four feet away from the crossing when I saw it come up on the crossing and stop. Q. Where was your engine at that time? A. I judge from about 75, between 75 and 100, yards, north [west] of the crossing. Q. What did you do? A. Well, as soon as I see what was happening, I put the brake on, on the emergency, and got myself back so as a piece of the truck or whatever might fly would not hit me. Q. How far did your train

go after you put on the emergency brakes? A. A little over a car length, between a car length and a car and a half south of the crossing. Q. Below the crossing? A. Yes. Q. What distance was that from where you put on the emergency brake? A. I could not rightly say what that distance would be, it may have been 400 feet or a little more, 450. Q. Mr. Davis, how far, from where you first saw this truck entering on the track and you put on the emergency brake, did your car go, before it stopped? A. Well, you mean the head of the train or the rear of the train? Q. Well, the train; I want to know how far it went? A. Well, I could not rightly give you just the distance it did go, but,— Q. Mr. Davis, when you saw this truck entering the track did you instantly put on the emergency? A. When I saw the truck coming I did not. Q. When you saw it entering the track? A. When I saw it entering the track and stop I put on the brake and the emergency. Q. How far do you judge your locomotive went from the time you saw that truck enter on the track and stop and you put on the emergency brake, how far did your engine go before it stopped, approximately, or as nearly as you can judge? A. Well, we were about probably 75 yards north of the crossing when I saw it, and the engine was probably,—the front of the engine was probably 100 yards south of the crossing when we stopped.''

Upon cross-examination, the engineman said the truck, when he first saw it, ''may have been five or six feet'' south of the track and approaching at ''right angles.'' His testimony continued: ''Q. How far did it go? [upon the track] A. Well, I thought about the front truck wheel was just about on the first rail. ........ Q. Then what did it do? A. The truck? Q. Yes? A. It didn't do anything. Q. At that time you hit it? A. Just about that time. Q. So the truck was moving at the time you hit it, is that right? A. No,

sir, the truck was not moving when I hit it, the truck was just about stopped before I hit it."

Another physical circumstance in the case, as shown by the testimony for plaintiff, was that the truck showed no damage on its left side (the side facing the approaching passenger train), but the broken parts, which indicated the point of impact with the locomotive, were in the center of the front of the radiator and extended along the right side. This evidence corroborates that of McKinney and Davis, that at the time of the collision the right front wheel was on the track.

We have quoted at length from the testimony of the only two eye witnesses of the accident because the primary question here involved must be determined by that evidence. It is whether there was any evidence from which a jury could reasonably be permitted to find that defendant's engineman was guilty of negligence in the operation of its train. In disposing of this inquiry we must read the testimony in the light most favorable to the plaintiff and resolve any conflicts therein against the defendant. The test upon this branch of the case is whether its engineman saw, or, in the exercise of due care, should have seen, the truck standing upon the track at a time when his train was at such a distance west of the crossing that it could have been stopped before reaching the truck.

Plaintiff relies upon the testimony of McKinney. The substance of his testimony is that when he looked up, approximately 1,200 feet east of the crossing, the train "was almost to the gut bridge as near as [he] could judge" and that "it looked to [him] from [his] distance away ....... as though [the] front wheel [of the truck] was just over the outside rail and standing still." In another portion of his testimony he said the accident happened within "a very few seconds" after he looked up. When it is recalled that the bridge was, by actual measurement, only 550 feet

west of the crossing and the train was approaching at the rate of approximately 60 feet a second, the significance of his reference to "seconds" is apparent.

The engineman's testimony was that he applied the emergency brake the instant he saw the truck "come up on the crossing and stop," and that the distance from the point at which the emergency brake was put on to the crossing was between 75 and 100 yards—at the most 300 feet. When we are dealing with the testimony of a witness who is facing an approaching train, more than 1,200 feet away and coming at a rate of 40 to 45 miles an hour, and he says it was in the vicinity of a bridge 550 feet beyond the crossing upon which the truck had then stopped, and are comparing his statement with that of another witness who says the distance in question was approximately 300 feet, we cannot say there is a material conflict in their testimony. The evidence for plaintiff does not contain any positive, definite statement fixing the location of the train when her husband drove upon the track. But if we give her the full benefit of McKinney's testimony, it was somewhere between 500 and 600 feet away. She proved by her expert witness that the distance required under the existing circumstances for stopping the train would be "between 450 and 500 feet." If McKinney's testimony be accepted at its full face value, we think the margin would be too narrow to support a finding that the engineman was negligent in failing to stop the train in time to avoid the collision; there is no other evidence in the case supporting a finding of negligence upon the part of defendant.

There was evidence from which a jury could reasonably infer that the engineman saw the truck approaching the crossing from the south when his train was still west of the gut bridge, but Tallman was then five or six feet south of the track and in a safe position.

Obviously, the engineman had no reasonable grounds to anticipate that the truck would be driven on the track, despite the danger signals and the warning whistle. This was not a case of an engineman having knowledge (and ample time to act upon it) that a truck had stopped upon a crossing he was approaching: Cf. Haller v. Pennsylvania R. R. Co., 306 Pa. 98, 159 A. 10. It is not contended that a speed of 40 to 45 miles an hour while approaching this crossing was excessive. In our opinion, plaintiff was not entitled to go to the jury upon the question of defendant's negligence and its point for binding instructions might well have been affirmed upon that ground alone.

There is another feature of this case, however, which would prevent recovery, no matter how clearly the negligence of defendant's employes might have been shown. We refer to the negligence of plaintiff's decedent. The presumption (to which plaintiff was entitled) that her husband performed his duty by stopping at a proper place and looking and listening was, we think, so completely rebutted by the uncontradicted testimony of the engineman that he did not stop, and also by the incontrovertible circumstances of the accident, that it became the duty of the trial judge to declare decedent's negligence, as a matter of law.

It is idle to contend that a driver performed his legal duty, if, in spite of what his eyes and ears must have told him, he drove in front of an approaching train and was struck within a few seconds. We agree with the following statement from the opinion, written for the court below by LARRABEE, J., in support of the judgment appealed from:

"It is readily apparent from a survey of the testimony that had George Tallman, driver of the truck, used due care before he drove onto this crossing, and looked to the west, he would have had a clear and un-

obstructed view of the approaching passenger train for a distance of a quarter of a mile and could readily have seen this train even though he had, for any reason, failed to hear the customary whistle signal for the crossing, which was given at the designated whistling point, several hundred feet west of the crossing.'' It may be added that, although entirely familiar with the crossing, he ignored the blinking light signals then in operation and warning persons coming from the south of the approach of the train.

Whether the truck stalled for some reason beyond Tallman's control, or whether he, suddenly aware of his danger, stopped it voluntarily and was attempting to back off the track, cannot be determined from any evidence in the case, nor is it material. If he became confused and bewildered by the circumstances surrounding him, the responsibility for being in a position of sudden peril was his alone. In the language of a paragraph of the syllabus in Hess v. Williamsport, etc., R. R., 181 Pa. 492, 37 A. 568, ''One who is struck by a moving train which was plainly visible from the point he occupied when it became his duty to stop must be conclusively presumed to have disregarded that rule of law and of common prudence, requiring him to stop, look and listen at a convenient distance from the railroad track before venturing to go upon it, and he will be presumed to have gone negligently into an obvious danger.''

Upon consideration of the record and the authorities cited, we are convinced that the learned trial judge should have affirmed defendant's point for binding instructions and that the court below was fully justified in subsequently entering judgment for the defendant, notwithstanding the verdict.

Judgment affirmed.